IN RE APPLICATION OF WILLIAM A. TYLER, SUPERINTENDENT. WILLIAM A. TYLER, SUPERINTENDENT OF BOARD OF DIRECTORS OF CONGREGATIONAL CONFERENCE OF NEBRASKA, APPELLANT, V. GERMAN CONGREGATIONAL CHURCH OF ZION ET AL., APPELLEES.

283 N. W. 512

FILED JANUARY 20, 1939.  No. 30453.

*Perry, Van Pelt & Marti* and *A. B. Wallace,* for appellant.

*Wills & Wills, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

SIMMONS, C. J.

This is an action brought under the provisions of sec-

tion 24-830, Comp. St. 1929, to secure the transfer of certain real estate of the German Congregational Church of Zion, of Butte, Nebraska, to the Board of Directors of the Congregational Conference of Nebraska.

The application is made by the superintendent of said conference. The action is resisted by three members of the church, who answer as trustees of the German Congregational Church of Zion, for themselves individually, and for all members of the said church and the church itself. For convenience in discussing the case, we will refer hereafter to the applicant as plaintiff and to the answering parties and the church, whose property is involved, as defendant.

Plaintiff alleges its own corporate capacity, the incorporation of defendant, that the defendant became affiliated with the other Congregational churches of this state in the congregational manner, "under, by virtue of and in accordance with the laws, customs, usages and discipline of the Congregational Conference of Nebraska;" that defendant does not now exist and does not now maintain its organization as a Congregational church in accordance with such laws, customs, usages, and discipline; alleges the defendant's ownership of property during its existence, and prays that the title of the property be transferred to plaintiff.

Defendant denies that the plaintiff is of the same religious denomination as the defendant, denies its affiliation with plaintiff, and alleges that it has at all times been, and now is, an independent existing organization, and that the plaintiff never exercised any authority or supervision over defendant.

Section 24-830, Comp. St. 1929, is as follows: "Whenever any religious society which is in any way under the control or supervision of any superior or general supervising body, ceases to exist or to maintain its organization, all its remaining real or personal property shall vest in, and be transferred, in the manner hereinafter provided, to the incorporated annual conference, presbytery, diocese, dio-

cesan council, state convention or other incorporated governing or supervising body of the same religious denomination within whose jurisdiction such society was located, or with which it was affiliated, it being intended that said property shall vest in and be transferred to the highest governing or supervising corporate body of the same denomination, having its original corporate existence within this state."

To maintain this action it is necessary for the plaintiff to establish two propositions: First, that the defendant church "is in any way under the control or supervision of any superior or general supervising body," and that the plaintiff is that general or superior supervising body; second, that the defendant has ceased "to exist or to maintain its organization."

The trial court found that the plaintiff "has no cause of action" and dismissed the application. Plaintiff appeals.

We first consider the question: Was the defendant "in any way under the control or supervision" of the plaintiff?

Control is defined as follows: "The word has no legal or technical meaning distinct from that given in its popular acceptation. It has been held as synonymous with superintendence, which is expressive of the meaning of the word, being defined as the act of superintending; care and foresight for the purpose of directing and with authority to direct; power or authority to check or restrain; restraining or directing influence; regulating power. Likewise the word 'control' is also sometimes employed or used as equivalent to, if not synonymous with, management; government; supervision." 13 C. J. 837.

Supervision is defined as follows: "Act of overseeing, or supervising; having general oversight of, especially as an officer vested with authority; inspection; oversight; superintendence. 'Supervision' implies oversight and direction." 60 C. J. 1164.

It appears to have been assumed at the trial that the plaintiff is the "incorporated annual conference * * * or other * * * governing or supervising body of the same re-

ligious denomination" of the Congregational churches of Nebraska. We will discuss that proposition only in so far as is necessary to consider it in relation to the problems presented by this case. The plaintiff conference was incorporated in 1910 by a group of men who recite in the preamble that they are members "of the religious denominational body or conference now known as the Congregational Conference of Nebraska," and that they incorporated "on behalf of ourselves and all others who are now or may hereafter become members of *this* corporation." The members of the plaintiff corporation "shall be such persons as have been duly elected directors of the Congregational Conference of Nebraska." Its objects, in part, are to coordinate under one management the "common activities of its members" and "to cooperate with our national beneficent societies, with the National Council of Congregational Churches, and with the *Nebraska* Home Missionary Society so long as that society shall maintain a *separate* existence," and "It shall receive * * * all * * * property * * * acquired * * * by the Nebraska Congregational Conference, *or to this corporation.*"

The plaintiff corporation by its articles is responsible and subject to the "authority of the Congregational Conference of Nebraska;" the qualifications of its treasurer are such as those required "in the constitution of the Congregational Conference of Nebraska." The constitution referred to is not in evidence. The plaintiff did not prove "the laws, customs, usages and discipline of the Congregational Conference of Nebraska." From a reading of the articles, there appears to be a difference between the plaintiff and the conference; also, that the conference is the governing body.

There was organized in 1857 in Nebraska by the Congregational churches an organization called "The General Association of Nebraska." The record does not disclose whether or not the General Association of Nebraska was a corporation; nor does it give much information about it. The plaintiff does not have "anything in a historical way

that would aid us in determining whether or not there was a sort of parent organization in 1857 and from there on down to the time of incorporation of this present body" and that the plaintiff is "simply a reorganization of the old organization."

The defendant in its articles of incorporation adopted a constitution "as is set forth and contained in the certain church manual known as that of Rev. M. E. Eversy, D. D." That "church manual" is not in evidence.

Plaintiff's superintendent was asked if he knew the Rev. Eversy. He answered that he did, and that Eversy "was superintendent of the *German* Congregational work for the whole country, for the United States." He was then asked and answered the following questions: "Q. Was he affiliated with your organization? A. Oh, yes; he was *employed* by the denomination. Q. Are you familiar with the manual there to some extent? A. I know what it was. It was a manual that *they* took as a constitution for *a* Congregational Church; since we are Congregationalists each church could adopt it or not." This evidence does not show that defendant was a part of the Congregational Conference or under its supervision or control, or under the supervision and control of plaintiff.

Defendant's articles further provide that the powers and duties of its trustees are as follows: "They shall hold the property of the church, superintend the raising of the minister's salary, provide for the incidental expenses, subject always to a direct vote of the church, but having no power to buy or sell, mortgage or *transfer* property, without a special vote of authority of the church."

After defendant's organization, it secured title to three lots in the city of Butte, upon one of which it built a church, and upon two lots it built a parsonage. The church building was later given to the English Congregational Church at Butte, and later became a part of the "community" church at Butte as it now exists, which the "Congregationalists" have a right to use. It likewise appears that the community church at Butte is not considered to be a Congregational

church. The lot upon which the church building was located was sold by the defendant in 1934. That sale was considered in this proceeding, and the district court quieted title in the purchaser. Plaintiff does not now seriously question that part of the decree.

Defendant secured a loan of $400 from the "Congregational Church Building Society of New York" in 1895. That mortgage contained a stipulation that the defendant shall "continue to be an *Evangelical* Congregational Church" and "make an annual contribution to the Congregational Church Building Society," and that, upon failure to do those and other things, the amount covered by the mortgage should become immediately due and payable, and that in the event the mortgage is paid the estate created by the mortgage became void. This mortgage was released of record by release dated in November, 1906. When asked regarding the organization of the mortgagee, plaintiff's superintendent replied: "We have in New York City what is called the Congregational Church Building Society which makes loans to Congregational Churches * * * and when I once inquired whether it could make a loan to a community church they said no, they could only make loans to Congregational Churches."

There is nothing in the record to show the authority and power of the Congregational Church Building Society of New York, and nothing other than the "we have" to show that it is in anywise connected with the plaintiff. The statement that they would make loans only to Congregational Churches, even if we disregard its hearsay status, does not show that that limitation was applicable when this mortgage was made in 1895. There is no evidence to show that an Evangelical Congregational Church is the same as the plaintiff church organizations. Quite obviously, the recitations in the mortgage were placed there as a part of the security for the loan. There is nothing in the mortgage or otherwise indicating that the plaintiff's preceding organization had anything to do with the securing of that loan by the defendant from the New York society. The defendant

in 1898 appears to have conveyed an undivided interest in the parsonage property to two other German Congregational Churches (one in Nebraska and one in South Dakota) and to have had that undivided interest reconveyed to it in 1905. There is nothing in the record to indicate that the plaintiff's preceding organization had anything to do with the conveyance away of this property or its conveyance back to the defendant.

It further appears, without the contract being in evidence, that the defendant contracted to sell the parsonage property in 1937, and that a part of defendant's remaining eight members had in mind the probable division of the proceeds of the sale among themselves. The bringing of this action resulted in the rescission of that contract of sale.

In addition to the provision in the mortgage, plaintiff contends that its supervision and control is shown by the fact that defendant made reports to the plaintiff from 1898 to 1922. These reports were made upon blanks sent out by the plaintiff or its predecessor to the pastor of the defendant. The pastor filled in the information called for on the blanks, and the plaintiff printed the information so furnished in its annual reports. These reports were purely statistical. They ceased in 1922, which year appears to have been the last year that defendant employed a full-time pastor. Subsequent to that time no reports were made.

Plaintiff did not offer the reports in evidence, and it "imagined" that they were destroyed. The defendant's records, written in German, were produced in court. They did not reveal that the defendant at any time ever authorized its pastor or any one else to make a report to the plaintiff, and no member of the church knows of special authority ever having been given to the pastor to do so, and no member of the church knew of the reports having been made. We conclude that these reports were made by the pastor at the request of, and for the information of, the plaintiff without authority from the defendant. There is no basis for holding that the pastor by making these reports recog-

nized any right of supervision or control of the defendant by the plaintiff.

The defendant's records further show that at different times it made contributions to the building society at New York, and to the Home Missionary Society. Plaintiff's superintendent testified that he "presumed" that that was the National Home Missionary Society in New York. Members of the defendant church testified that they made contributions to missions and to other purposes. There is nothing in the record indicating that the defendant church ever made contributions to the plaintiff, although it appears that, if contributions were made to different national organizations, those organizations in turn reported to the plaintiff that they had received the contributions from the defendant. This was purely a voluntary matter so far as the contributions were concerned, and the reports were statistical.

The plaintiff's superintendent testified that the Congregational Churches in Nebraska were organized "first into a district association and then into the state conference * * * and then we have our national conference." There is nothing to indicate that defendant ever joined in any way, was represented at, or participated in the district association or the state conference of the plaintiff. The superintendent further testified that the German Congregational Churches in Nebraska have "the *privilege* of nominating two members of the board of directors." This apparently presupposes a German Congregational Church organization or some association of the German Congregational Churches that could nominate two members of plaintiff's board. Here again the record does not indicate that the defendant church ever had anything to do with such a German Congregational Church organization, or that it ever participated in such an association or conference, for the nomination of members of plaintiff's board or otherwise.

In answer to the question as to whether or not the plaintiff recommended pastors to the different German Congregational Churches of Nebraska, the superintendent an-

swered that they never recommended pastors to any church "except as they ask us to." There is nothing in the record indicating that the defendant ever asked the plaintiff to recommend a pastor or to assist the defendant church in any way about a pastor or in any other manner. Plaintiff's superintendent further in answer to the above question stated: "Now the Congregational and Baptist and others that have a congregational form of organization *do not claim to have authority over the churches; we have only general supervision.*" Later when asked, "What is the nature of the supervision of your conference over these German Churches, for instance, over the German Congregational Church of Zion here at Butte?" he answered: "Our supervision over all the churches, as I mentioned a moment ago, differs from the Methodists; *we do not have supervision over the church.* * * * We work with them for their general welfare, and we give them special services, if they desire it."

He was next asked, "Do you have anything further in regard to the supervision, or do you think that covers it?" He answered: "Well, I might say that the *German* Churches do have a more special supervision by the *German* Superintendent, but *their* German Conference is a *national organization,* so we have, as a state organization, general supervision over them as well as the others." This statement again indicates that the defendant, if subject to supervision from any one, is subject to a German Conference and a German Superintendent. The record is silent as to what that supervision may be, as it likewise is silent on the question of the German Congregational Church organization. There is no evidence to show the basis of this contention that "we have general supervision over them." Outside of the reports which were sent in by the pastor to the plaintiff, at the plaintiff's request and on its blanks, the only contact that the plaintiff ever appears to have had with the defendant was that "once or twice a good many years ago" the superintendent "happened to be in Butte; talked with some of the officers, and tried to find out how they

were getting along." He further testified that he was acquainted with the church property, and that, at the time the church building was moved away, he talked with some of the members of the "English Congregational Church," who asked him if it was all right to move the church over for the use of the English Church, ·and he said that he thought that it was.

Here it is noted that he did not talk with the defendant, but with members of the *English* Congregational Church, who were securing the defendant's church building. The defendant did not ask the consent of the plaintiff for permission to dispose of its church building, nor did it submit the matter to them for their advice or approval. The defendant did not ask the plaintiff for permission to sell its parsonage property, and quite clearly it was the belief of all the members of the defendant church that they had the right to dispose of their property according to the provisions of their articles of incorporation. There is nothing in the record indicating that any member of the defendant church ever had any idea that the plaintiff ever had, or claimed to have, any control or supervision in any way over the defendant. There is no showing that the defendant ever authorized a "transfer" of its property to the plaintiff "by a special vote of authority of the church," as provided in defendant's articles of incorporation; neither did it take any step by such a "special vote" that can be construed to intend such a transfer.

Plaintiff is not shown to have given any aid or assistance to, or concerned itself with, defendant's spiritual or temporal problems. It contributed nothing to the defendant. It now asks for title to defendant's property. We conclude that the plaintiff has not shown that the defendant was in "any way under the supervision or control" of the plaintiff.

Defendant does not appear to have ever had a large congregation. It did maintain a regular pastor for some time. The deeds to the other churches which are in evidence, reciting that the undivided interest of each of the parties shall be "in such proportion as the membership of each of

the several churches herein mentioned shall be to the aggregate membership of the three churches," indicate that three churches in that community were using the parsonage as a place of residence for a minister who served all three churches. The defendant has a cemetery (not involved in this action) where it buries its dead. After 1922, up to and including the time of the disposition of the church building, ministers from other churches conducted services in defendant's church building, probably once a month, and not later than two years ago a minister came and administered the sacrament of the Lord's Supper to defendant's members.

The church records are not elaborate. The term of office of the trustees had expired at the time of the hearing in the district court, but their successors had not been elected or qualified, and those hold-over trustees were continuing to handle the parsonage property, to repair it, collect the rent, and pay the taxes upon it. They appear to have held irregular meetings to transact the business of the church, and, as trustees, entered into the contract to sell the parsonage property. Members of the defendant church who understand the English language attend the community church. The membership at the present time consists of eight people who desire to have certain religious services, including the sacrament of the Lord's Supper, given in their native language, which they best understand. They are all elderly people. No action has been taken to dissolve defendant's corporate capacity, and the membership clearly presumed and intended that they were maintaining their organization. Even plaintiff's records show the defendant church was inactive in 1931 and "dropped" in 1933. The fact that plaintiff "dropped" defendant from its records does not show that defendant has ceased to exist or to maintain its organization.

One of the defendant's trustees testified that the purpose of selling the parsonage property was "to liquidate it." And in answer to the question, "You figured the church property ought to be liquidated?" he answered, "Yes."

When asked if the reason was that "they were not able to carry on the church organization and carry on an active religious society?" he replied, "I wouldn't want to say just that, I couldn't express just what the others might say."

He was then asked, "There was no necessity, if you disposed of the church property and the contents and everything, there was no necessity for a parsonage, was there?" A. "Not in particular; no."

The defendant no longer had use for a parsonage building. It proposed to sell the parsonage as it had its personal property and had disposed of its church building by gift to another church. A religious society can exist without having either a church building or a parsonage. It is common knowledge that many church organizations have existed in Nebraska throughout the entire period of our history, holding their services in homes, schoolhouses, and quite often in church buildings owned by other denominations. Many religious societies in Nebraska have no tangible property, but they exist, maintain their organizations, serve their members and their communities, and are distinct forces for good in our citizenship. Defendant still continues as a church organization, ministering to its members as they desire, and is in a position to bury its dead.

We are not presented with, and do not decide, the question as to what disposition should be made of the proceeds of the sale of the parsonage property should it be subsequently sold.

We conclude that the decree of the district court was proper, and accordingly it is

AFFIRMED.